NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-834

COMMONWEALTH

vs.

LORENZO JONES.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In February 2023, following a jury trial in the Superior Court, the defendant, Lorenzo Jones, was found guilty of possession of a firearm without a license, subsequent offense, in violation of G. L. c. 269, § 10 (a).[1]  Police recovered the firearm the defendant was convicted of possessing after conducting a stop of a vehicle on the morning of January 27, 2014 (January 27 stop).  On appeal, the defendant argues that reversal of his conviction is required for the following reasons:  (1) the trial judge failed to instruct the jury that

---

[1] The defendant pleaded guilty to the subsequent offense portion of the indictment following the trial.  The defendant was acquitted of two charges of murder in violation of G. L. c. 265, § 1.

the Commonwealth must prove that he lacked a firearms license as required by Commonwealth v. Guardado, 491 Mass. 666 (2023) (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024); (2) due to an ambiguous jury instruction, the defendant was convicted of a crime for which he was never indicted; (3) the evidence was insufficient to prove that the defendant possessed the firearm; and (4) the fruits of the January 27 stop, including the firearm, should have been suppressed.  Because the Commonwealth failed to prove the absence of licensure, we vacate the defendant's conviction.

Background.  1.  Motion to suppress.  The motion judge found the following facts after the evidentiary hearing on the motion to suppress the evidence obtained from the January 27 stop.  On January 26, 2014, Boston police Officer John Burrows received a tip from a confidential informant (CI) that Steven Stephen, who was known to Boston police to be involved in ongoing gang feuds and to have a prior firearm conviction, had a gun.  The CI informed Burrows that Stephen, Tony Evans, with whom Burrows also was familiar, and a woman (female passenger) would be in a red Chevrolet Cruze in a parking lot behind Flames restaurant that evening.  The CI also provided the registration number of the car.

2

Burrows was off duty when he received the information, but relayed the tip to the Boston police department's youth violence strike force. Around 10:00 P.M. and within ten minutes of receiving the tip from Burrows, officers went to the restaurant to look for Stephen and the vehicle. Upon locating the Cruze behind the Flames restaurant, the officers ordered its three occupants, Stephen, Evans, and the female passenger, out of the vehicle, pat frisked Stephen and Evans, and searched the car for a firearm. It is undisputed that the officers did not pat frisk the female passenger. The officers did not recover a firearm and the three occupants left in the Cruze. Approximately two hours after the officers conducted their search, Burrows testified that the CI called him back and informed him that the officers had "missed" the gun.

The following morning, January 27, Burrows reported to work and learned that three people were fatally shot overnight. Burrows recognized the names of two of the victims through his work with the youth violence strike force. While on patrol with Officer Joseph Connolly at 10:43 A.M., Burrows saw the Cruze and initiated a stop using the blue lights and siren. After the Cruze stopped, the officers approached the car, but could not see inside to identify the occupants. As they approached, Burrows saw Evans lying on the back seat of the Cruze. The car

3

then drove off. The officers got back into their unmarked cruiser and followed the Cruze until it stopped in the middle of Wayland Street. The driver, a Black man, immediately fled on foot and the officers were not able to catch him. Evans and the female passenger were removed from the Cruze, handcuffed, and briefly detained, but ultimately allowed to leave. Officers found a firearm a short distance from the Cruze on the side of the road. The Cruze was towed and a warrant was later obtained to search the vehicle.

2. <u>Trial</u>. The following evidence was presented at trial. At approximately 2:44 <u>A</u>.<u>M</u>. on January 27, the "Shotspotter" system[2] detected a series of gunshots on Rosewood Street in the Mattapan section of Boston. When Boston police officers responded to the scene, they found Clarence McGregor who had suffered fifteen gunshot wounds and Teasia Montgomery who had suffered two gunshot wounds. Both McGregor and Montgomery were transported to the hospital where they were pronounced dead.[3] From the area, the officers ultimately recovered twenty-six

---

[2] ShotSpotter is "a system that identifies firearm discharges by sound and directs officers to the general location of the shots." <u>Commonwealth</u> v. <u>Evelyn</u>, 485 Mass. 691, 694 (2020).

[3] On that same evening, a third person was a victim of homicide. However, no connection between McGregor and Montgomery's murders and the murder of that victim was offered at trial.

4

shell casings from two different firearms and concluded that there were two shooters.

Burrows and Connolly testified at trial about the stop of the Cruze later that morning described above. In addition, Connolly testified that he chased after the driver of the vehicle, who Connolly described as a six-foot muscular Black man wearing all gray and a black knit hat. Burrows, who stayed with the Cruze, and another officer pat frisked the female passenger and Evans, but recovered no contraband. Burrows then found the firearm lying under a nearby car on Wayland Street in close proximity to the Cruze. After the Cruze was towed to a Boston police facility,[4] two cell phones were also recovered from the car.

The police soon learned that the Cruze, and one of the cell phones found in the vehicle, belonged to a woman who was dating the defendant at the time (girlfriend). The girlfriend testified that the defendant had free access to her apartment and used her car often. The girlfriend also testified that the defendant freely used her cell phone including times when she was not with him and times when she left her phone in the Cruze. The girlfriend did not have the Cruze the night of January 26.

---

[4] The Cruze was towed because neither Evans nor the female passenger owned the vehicle.

Ballistics linked the gun found by the Cruze to eighteen shell casings recovered from the murder scene where McGregor and Montgomery were killed.  The gun was tested for deoxyribonucleic acid (DNA) evidence and the results indicated a "mixture" from several people.  Evans and Stephen were excluded from the mixture, but the defendant was not.  The Commonwealth subsequently sent the DNA samples to a private laboratory which concluded that an evidence match between the gun and the defendant was "[fifty thousand] times more probable than a coincidental match to an unrelated African American person."  A jacket bearing the defendant's name was also recovered from the Cruze, and the defendant's fingerprints were found on an energy drink can and other items located in the interior of the car.

Cell site location information (CSLI) records showed that the cell phone associated with the girlfriend, which was purportedly used by the defendant, and the cell phone associated with Evans, used the same cellular tower from 2:15 A.M. to 2:40 A.M., the minutes immediately prior to the murders.  The cell phones associated with the girlfriend, the female passenger, and Evans utilized cellular towers traveling away from the area of the murders immediately after the shooting. Two photographs that were taken just after 4:00 A.M. were subsequently discovered on the female passenger's cell phone and

6

depicted the defendant and Evans together at a Dunkin Donuts located in Braintree. The cell phones associated with the girlfriend, the female passenger, and Evans all used the same cell tower from 8:30 A.M. to 9:30 A.M. on the morning of January 27, 2014, approximately one hour before the Cruze was stopped by Burrows and Connolly.

3. Procedural history. On March 29, 2016, the defendant was indicted on two counts of murder and one count of unlawful possession of a firearm, subsequent offense. On May 18, 2017, the defendant moved to suppress the fruits of the January 27 stop, including the firearm. After an evidentiary hearing in January of 2018, the motion judge denied the motion on November 5, 2018, via a written decision. Prior to trial, on December 14, 2022, the defendant filed a motion to disclose the identity of the CI who provided Burrows with the tip that led to the January 26, 2014, stop of the Cruze at Flames restaurant. A different judge (trial judge) conducted an in camera interview of the CI, and on February 13, 2023, denied the defendant's motion. Ultimately, following a jury trial that commenced on January 17, 2023, and concluded on February 23, 2023, the defendant was found guilty of unlawful possession of a firearm but was acquitted of the murder charges. After the jury were dismissed, the defendant pleaded guilty to the subsequent

offense portion of the unlawful possession of a firearm indictment.  The defendant filed a timely appeal.

Discussion.  1.  Guardado error.  The defendant argues that reversal of his conviction is required because the trial judge, who did not have the benefit of Guardado I, failed to instruct the jury that the Commonwealth was obliged to prove that the defendant lacked a firearms license.[5]  In Commonwealth v. Crowder, 495 Mass. 552, 559 (2025), petition for cert. filed, U.S. Supreme Ct., No. 24-7498 (June 25, 2025), a case which was pending at the time the defendant submitted this appeal, the Supreme Judicial Court concluded that a new trial is the proper remedy in circumstances where a defendant's trial occurred between the issuing of the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), and the Supreme Judicial Court's decision in Guardado I, 491 Mass. 666.  Because the defendant's trial occurred during the interim, a new trial is the appropriate remedy.

2.  Jury instructions.  The defendant argues that the jury were erroneously instructed as to the time frame that the defendant allegedly possessed the firearm in question.  In

---

[5] The Commonwealth disagrees that reversal is required but concedes that a new trial is warranted due to its failure to prove lack of licensure.

support of this argument, the defendant asserts that the Commonwealth, during a hearing on one of the defendant's motions to suppress, limited the defendant's possession to the time of the murders themselves, at approximately 2:44 A.M. on January 27, 2014.  Therefore, the defendant avers that the judge was required to instruct the jury that they may only find the defendant guilty of unlawful possession of the firearm if the Commonwealth proved that he possessed it at the time of the shooting.  The argument is unavailing.

Because the defendant did not object to the jury instructions during the trial, we review his claim for a substantial risk of a miscarriage of justice.  See Commonwealth v. Fortini, 68 Mass. App. Ct. 701, 706 (2007).  Here, the trial judge properly instructed the jury of the elements of unlawful possession of a firearm (with the exception of the instruction on licensure discussed above).  Likewise, the defendant's indictment clearly states that the defendant "on January 27, 2014, did unlawfully and knowingly have in his possession a firearm."  Furthermore, in its bill of particulars, the Commonwealth alleged that the defendant possessed a firearm on January 27, 2014, both "at about 2:43 A.M." as a participant in the shootings of McGregor and Montgomery, and "continued to possess a firearm for several hours thereafter until the firearm

9

was discarded in the vicinity of 65 Wayland Street."  We discern no error.

Additionally, contrary to the defendant's assertion, the Commonwealth did not limit itself to a narrower time frame during a hearing on one of the defendant's motions to suppress. While it is true that the Commonwealth did argue at that hearing that the defendant did not have automatic standing to move to suppress the firearm recovered on Wayland Street because he was only indicted for possessing a firearm at the time of the shooting, the motion judge never addressed the Commonwealth's standing arguments in her decision on the defendant's motion. Furthermore, the bill of particulars, which alleged the defendant possessed the firearm from the time of the shooting until it was abandoned on Wayland Street, was provided to the defendant well after the Commonwealth made this argument.[6] Accordingly, the trial judge made no error in his instructions to the jury on this issue, nor was the defendant convicted of a crime for which he was not indicted.

3. Evidence of possession.  The defendant argues that reversal of his conviction is required because there was

---

[6] The defendant lodged no objection to the bill of particulars.

10

insufficient evidence presented at trial to convict him of unlawful possession of a firearm.  We disagree.

When reviewing claims of insufficient evidence presented at trial, "we assess the evidence in the light most favorable to the Commonwealth 'to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt.'"  Commonwealth v. Baez, 494 Mass. 396, 400 (2024), quoting Commonwealth v. Robinson, 493 Mass. 303, 307 (2024).  "The evidence may be direct or circumstantial, and we draw all reasonable inferences in favor of the Commonwealth" (citation omitted).  Baez, supra.

To sustain a conviction under G. L. c. 269, § 10 (a), the Commonwealth was required to prove that the defendant knowingly possessed a firearm outside of his residence or place of business absent compliance with the relevant licensing provisions.[7]  See Commonwealth v. Taylor, 486 Mass. 469, 473 (2020).

Here, when viewing the evidence in the light most favorable to the Commonwealth, ample evidence was presented from which a jury could infer that the defendant possessed the firearm that Burrows recovered near the Cruze on Wayland Street.  Notably,

---

[7] As noted above, following Guardado I, the Commonwealth must also prove that the defendant lacked a firearms license.

11

the jury heard evidence that the DNA found on the gun was fifty thousand times more likely to match the defendant than an unrelated African American person.  In addition to the DNA evidence, the defendant's fingerprints were found on items in the Cruze, and a jacket bearing the defendant's name was also recovered from the vehicle.  The jury also heard evidence that the defendant frequently used the Cruze, which was owned by his girlfriend.

Furthermore, the jury were presented with CSLI records and photographic evidence from which they could reasonably infer that the defendant and the other two occupants of the Cruze, Evans and the female passenger, were together in the hours after the shooting and remained together close to the time that Burrows stopped the Cruze.  Additionally, while relatively generic and of little import standing alone, Connolly's description of the fleeing driver did match the defendant's build and skin color, as evidenced by the surveillance photograph that captured the driver fleeing the scene.  See Commonwealth v. Davis, 487 Mass. 448, 468 (2021), S.C., 491 Mass. 1011 (2023), and cases cited therein.  In sum, given the totality of the evidence, it was reasonable for the jury to infer that the defendant was the driver of the Cruze at the time it was stopped on the morning of January 27, 2014, and possessed

12

the firearm until he abandoned it while fleeing on Wayland Street. Accordingly, there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that the defendant unlawfully possessed the firearm. See Baez, 494 Mass. at 400.

4. Denial of motion to suppress. Finally, the defendant argues that the motion judge erred by failing to suppress the fruits of the January 27 stop, including the firearm, because the police lacked reasonable suspicion to stop the Cruze that morning. We are not persuaded.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the judge's] ultimate findings and conclusions of law" (citation omitted). Crowder, 495 Mass. at 565.

The defendant argues that the police lacked reasonable suspicion to conduct the January 27 stop on the basis that the CI, when interviewed in camera by the trial judge in February of 2023, supplied information that purportedly contradicted Burrows's testimony five years earlier at the January 2018 hearing on the defendant's motion to suppress. Importantly, at the suppression hearing the motion judge did not hear testimony from the CI but heard testimony from Burrows who relayed what

13

the CI had told him on January 26, 2014.  For example, Burrows testified that the CI informed him that Stephen had a gun, while the CI recalled during the 2023 interview that the CI informed Burrows that Evans and Stephen "were looking for a gun." Burrows also testified that the CI called him back a few hours after the search of the Cruze on the evening of January 26 and told him that the officers had "missed" the gun.  Conversely, the CI said during the in camera interview that the CI "does not recall contacting Burrows again that night [after providing him with the original tip on January 26, 2014,] and does not recall telling Burrows that they missed the gun."

The defendant argues that because the version of the CI's tip from the 2023 interview would not supply the police with reasonable suspicion to conduct the January 27 stop, the stop was unconstitutional.[8]  This argument is flawed in multiple respects.

First, nine years passed between when the CI gave the tip about the Cruze to Burrows in 2014, and when the CI was interviewed by the trial judge in 2023.  It is therefore understandable that the CI's memory of events in 2023 may differ from what the CI told Burrows nine years earlier, or that the CI

_____

[8] Based on the CI's interview responses, the defendant filed a motion to reverse the order denying the motion to suppress. The defendant's motion was denied after a hearing.

14

may not recall contacting Burrows a second time on the evening of January 26 to let him know that he missed the gun. Second, the interview with the CI that the trial judge conducted concerned whether the CI's identity should be disclosed to the defendant. The trial judge did not interview the CI to make his own determination regarding whether the police had reasonable suspicion to conduct the January 27 stop, and did not have the benefit of an evidentiary hearing to evaluate Burrows's credibility in light of the CI's interview responses. Accordingly, the defendant's argument fails.

We further conclude that there was no error in the motion judge's determination that Burrows and Connolly had reasonable suspicion to conduct the January 27 stop based on the evidence adduced at the hearing on the defendant's motion to suppress. To justify a warrantless investigatory stop, the police must have reasonable suspicion that the individual they stop "has committed, is committing, or is about to commit a crime." Commonwealth v. Silva, 366 Mass. 402, 405 (1974). "Reasonable suspicion 'must be based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience.'" Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 8 (2023), quoting Commonwealth v. Gomes, 453 Mass. 506, 511 (2009).

15

Here, while on patrol on the morning of January 27, Burrows saw the same vehicle that police had searched the evening before for an illegal firearm based on a tip that Stephen possessed a firearm. After the officers failed to recover the firearm during that search on the evening of January 26, Burrows received a follow up call from the CI that the officers who performed the search had "missed" the gun. While Burrows could not identify the three occupants of the vehicle before initiating the stop the following morning, he knew that two of the occupants of the vehicle from the night before, Stephen and Evans, had gang affiliations, and that Stephen was involved in ongoing gang feuds and had a prior firearm conviction. Given these facts, Burrows and Connolly could reasonably suspect that Stephen was present in the Cruze and possessed an illegal firearm.[9] See Robinson-Van Rader, 492 Mass. at 8.

Conclusion. Because the trial judge did not instruct the jury that the Commonwealth must prove that the defendant lacked a firearms license, and the Commonwealth did not prove the same,

---

[9] Because we conclude that the officers had reasonable suspicion to conduct the January 27 stop, we need not address the defendant's argument concerning whether he had a reasonable expectation of privacy in the firearm found on Wayland Street.

16

we vacate the judgment and set aside the verdict and the subsequent offense finding.[10]

          So ordered.

          By the Court (Desmond,
            Smyth & Tan, JJ.[11]),

          Clerk

Entered:  September 8, 2025.

---

[10] The Commonwealth may retry the defendant on the indictment charging possession of a firearm without a license as a subsequent offense if it so choses.  See Crowder, 495 Mass. at 559.

[11] The panelists are listed in order of seniority.

17